**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T JASON NOYE,** | : | |
| **individually and on behalf** | : | |
| **of all others similarly situated,** | : | **No. 1:15-cv-2382** |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **JOHNSON & JOHNSON and** | : | |
| **KELLY SERVICES, INC.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendant Kelly Services Inc.'s ("Kelly") renewed motion to compel arbitration and to stay the above-captioned case pending completion of the arbitration. (Doc. No. 72.) Also before the Court is Defendant Johnson & Johnson Services, Inc.'s ("J&J") renewed motion to compel arbitration and dismiss or, in the alternative, stay all proceedings. (Doc. No. 74.) For the reasons that follow, the Court will grant Defendant Kelly's renewed motion (Doc. No. 72), and will grant in part and deny in part Defendant J&J's renewed motion (Doc. No. 74).

## I. BACKGROUND

In February 2015, Plaintiff T Jason Noye interviewed at a job fair for a position with J&J through the staffing company, Kelly.[1] (Doc. No. 76-1 at 2.) On February 11, 2015, a recruiter from Kelly offered Plaintiff a position with J&J as an operations supervisor. (Doc. No. 76-1 at 2; see Doc. No. 76-4 at 16.) Plaintiff responded to the Kelly recruiter by stating that he "would like to accept the position." (Doc. No. 76-2 at 2.) On February 12, 2015, the Kelly recruiter asked Plaintiff to complete Kelly's online application. (Doc. No. 76-3 at 2.)

---

[1] According to Defendant J&J, the complaint "improperly names "Johnson and Johnson" as a Defendant; the correct Defendant entity is Johnson & Johnson Services, Inc." (Doc. No. 75 at 5 n.1.)

The online application required Plaintiff to complete the then-viewed page before proceeding to the next page of the application. (Doc. No. 72-4 at 12-13; Tr. at 88: 2-16; 93: 20-22.) One such page of the application was an "arbitration screen" that included a link to a document titled "Dispute Resolution and Mutual Agreement to Binding Arbitration" ("Arbitration Agreement").[2] (Doc. Nos. 72-4 at 14; Tr. at 99: 3-6; 100: 3-11; 72-5 at 2; Tr. at 37: 12-21.) Paragraph 1 of the Arbitration Agreement provides, in relevant part, as follows:

> **1. Agreement to Arbitration.** Kelly Services, Inc. ("Kelly Services") and I agree to use binding arbitration, instead of going to court, for any "Covered Claims" that arise between me and Kelly Services, its related and affiliated companies, and/or any current or former employee of Kelly Services or any related or affiliated company.

(Doc. No. 72-2 at 2.) "Covered Claims" under the Arbitration Agreement include "all common-law and statutory claims related to [Plaintiff's] employment . . . ." (Id.) The Arbitration Agreement states in bold that arbitration is the "only forum for resolving Covered Claims" and that Defendant Kelly and Plaintiff waive the right to a jury- and bench trial. (Id.) The online application did not allow Plaintiff to bypass the "arbitration screen," though the terms of the Arbitration Agreement were only viewable if the applicant clicked on a link at the top of the screen.[3] (Doc. No. 72-5 at 2; Tr. at 38: 1-24.)

At another stage in the application, Plaintiff informed Kelly that he had been convicted of a crime. (Doc. Nos. 72-4 at 11; Tr. at 87: 15-24; 76-12 at 2.) Kelly later requested information about Plaintiff's conviction (Doc. No. 76-7 at 2), and Plaintiff alleges that he provided the additional documentation "promptly" thereafter (Doc. No. 1 ¶¶ 28-29). On February 13, 2015, after completing the online application, Plaintiff printed his name and signed a separate

---

[2] The Arbitration Agreement includes the "typewritten" signature of "T Noye," dated February 12, 2015, and the handwritten signature of Nina Ramsey, Defendant Kelly's Chief Human Resources Officer, dated February 12, 2015. (Doc. No. 39-4 at 8.)

[3] The Arbitration Agreement was also available at the conclusion of the application in a "list of forms" to save and print. (Doc. No. 72-5 at 5; Tr. at 45: 4-14.)

document that was titled: "Employment Agreement for Contract Labor Employees on Assignment at Johnson & Johnson" ("Employment Agreement"). (Doc. No. 76-10 at 5; see Doc. No. 76-11 at 8.) Kelly employees administered this Employment Agreement "in connection with candidates for hire at Kelly who would be placed at J&J locations." (Doc. No. 76-4 at 15; Tr. at 97: 20-24.)

On February 20, 2015, a Kelly employee signed the Employment Agreement (Doc. Nos. 76 at 12; 77-5 at 20; Tr. at 99: 2-20), and a Kelly "on-boarding coordinator" also sent Plaintiff an e-mail stating that Plaintiff had "been hired" and welcoming him to "the Kelly Team!" (Doc. No. 76-8 at 2-3). However, on March 13, 2015, the Kelly recruiter informed Plaintiff via e-mail that "J&J cannot hire" Plaintiff and noted that he would keep Plaintiff "in mind for other opportunities." (Doc. No. 76-13 at 2.) According to the complaint, J&J decided not to hire Plaintiff because of a background report Kelly had purchased from Yale Associates, Inc. ("Yale"). (Doc. No. 1 ¶¶ 4, 30, 32-33.) Plaintiff claims that the Yale report misreported four summary offenses as misdemeanors and caused him to lose the Johnson & Johnson position. (Id. ¶ 34.)

On December 11, 2015, Plaintiff initiated the above-captioned action against Defendants J&J and Kelly. Plaintiff alleges that Defendants violated the Fair Credit Reporting Act's ("FCRA") disclosure requirements, 15 U.S.C. § 1681b(b)(2) (Doc. No. 1 ¶¶ 5-6, 20, 23, 27, 61), and the requirement to provide applicants with a copy of the report and a description of consumer rights under the FCRA, 15 U.S.C. § 1681b(b)(3) (id. ¶¶ 7-8, 11, 69). Plaintiff brings suit on behalf of himself and putative class members. Plaintiff seeks statutory damages, punitive damages, as well as attorneys' fees and costs. (Id. ¶¶ 47, 50-57.)

On February 22, 2016, in lieu of filing an answer to the complaint (Doc. Nos. 24, 27), Defendant Kelly filed a motion to compel arbitration and stay the case. (Doc. No. 39.) The Court denied without prejudice Kelly's motion to compel arbitration and ordered the parties to conduct limited arbitration-related discovery. (Doc. No. 62.) Similarly, on February 22, 2016, Defendant J&J filed a separate motion to compel arbitration (Doc. No. 40), which the Court denied without prejudice on September 7, 2016 (Doc. No. 63)

On January 30, 2017, Defendant Kelly filed a renewed motion to compel arbitration and to stay the action pending arbitration. (Doc. No. 72.) Defendant J&J filed a separate motion to compel arbitration and dismiss or, in the alternative, stay all proceedings on January 30, 2017. (Doc. No. 74.) The parties have briefed Kelly and J&J's renewed motions to compel arbitration, and the pending motions are ripe for disposition.

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, provides the "body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes" and expresses a "strong federal policy in favor of resolving disputes through arbitration." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2009). Even in light of the FAA, arbitration is "strictly a matter of contract." Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999). "If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." Id. "Thus, in deciding whether a party may be compelled to arbitrate under the FAA, we first consider '(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.'" Flintkote Co. v. Aviva PLC, 769 F.3d 215, 220 (3d Cir. 2014) (quoting Century Indem., 584 F.3d at 527).

As to the first question, the United States Court of Appeals for the Third Circuit has recently clarified "the standard for district courts to apply when determining whether, in a specific case, an agreement to arbitrate was actually reached." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 771 (3d Cir. 2013). In effect, to determine whether there is a valid agreement to arbitrate, a district court "must initially decide whether the determination is made under Fed. R. Civ. P. 12(b)(6) or 56." Sanford v. Bracewell & Guiliani, LLP, No. 14-1763, 2015 WL 4035614, at *2 (3d Cir. July 2, 2015). Having already permitted limited discovery on the question of arbitrability, the Court applies the summary judgment standard to Defendant Kelly's renewed motion to compel arbitration.

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

At the summary judgment stage, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007). In deciding a motion for summary judgment, the Court need not accept allegations that are merely conclusory in nature, whether they are made in the complaint or a sworn statement. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Moreover, the Court's function is not to make credibility determinations, weigh evidence, or

draw inferences from the facts.  <u>Anderson</u>, 477 U.S. at 249.  Rather, the Court must simply "determine whether there is a genuine issue for trial."  <u>Id.</u>

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv. Grp. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. <u>Celotex</u>, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  <u>Anderson</u>, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

III.    **DISCUSSION**

A.    **Defendant Kelly's Renewed Motion to Compel Arbitration**

Defendant Kelly argues that Plaintiff must be compelled to arbitrate his claims against Kelly because Plaintiff entered into the Arbitration Agreement and that Plaintiff's claims fall

within the scope of the Arbitration Agreement.  (Doc. No. 73 at 14.)   The Court first addresses whether a valid agreement to arbitrate exists between Plaintiff and Defendant Kelly.[4]

### 1.  The Arbitration Agreement

Defendant Kelly argues that Plaintiff electronically signed the Arbitration Agreement on February 12, 2015.  (Doc. No. 73 at 7, 9, 14-15.)  Plaintiff does not unequivocally dispute the existence of the Arbitration Agreement, but stresses that Plaintiff cannot recall the agreement. (Doc. No. 76 at 9-10.)

 "An unequivocal denial that the agreement had been made, accompanied by supporting affidavits, however, in most cases should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.'"  Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 55 (3d Cir. 1980).  However, the Third Circuit has recognized a distinction between: (1) a claim that a plaintiff was never provided with a copy of the arbitration agreement; and (2) a claim asserting the inability to "recall seeing or reviewing" the contract.  See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 162 (3d Cir. 2009) (citing Tinder v. Pinkerton Sec., 305 F.3d 728, 736 (7th Cir. 2002)).  It is presumed "that one who signs a contract knows its nature and understands its contents."  Payne Broder & Fossee, P.C. v. Shefman, No. 312659,

---

[4] The Arbitration Agreement includes a "choice of law" section that provides that "any disputes related to my employment relationship with Kelly Services shall be governed by the laws of the State of Michigan . . .  regardless of conflicts of law principles."  (Doc. No. 72-2 at 2.)  Both Plaintiff and Kelly appear to concede that the applicable standards under Pennsylvania and Michigan law are "not materially different."  (Doc. No. 76 at 15-16 n.6; see Doc. No. 73 at 15 n.3.)  In its discussion of Pennsylvania's "choice of law" analysis, the Third Circuit noted that, "[i]f two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary."  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).  "[I]f there are no relevant differences between the laws of the two states . . .  the court does not have to engage in a choice of law analysis, and may refer to the states' laws interchangeably."  Id. at 229 (citing Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006)).  Here, the Court agrees with the parties' representation that Pennsylvania and Michigan law are not materially different for purposes of determining whether a valid agreement to arbitrate exists between Plaintiff and Defendant Kelly.  (Doc. No. 76 at 15-16 n.6; see Doc. No. 73 at 15 n.3.)

2014 WL 3612699, at *4 (Mich. Ct. App. July 22, 2014) (applying Michigan law); <u>Allstate Life Ins. Co. v. Ramich</u>, No. 03-6842, 2004 WL 2611947, at *2 (E.D. Pa. Oct. 21, 2004) (applying Pennsylvania law) ("The law presumes persons who sign papers do so with a full knowledge of their contents; 'otherwise most contracts would not be worth the paper they are written on.'") (quoting <u>In re Birkbeck's Estate</u>, 64 A. 536 (Pa. 1906)).

Here, the Arbitration Agreement was electronically signed by "T Noye," on February 12, 2015, and Nina Ramsey, Defendant Kelly's Chief Human Resources Officer, on February 12, 2015. (Doc. No. 39-4 at 8.) In his deposition, Plaintiff testified that he did not remember the Arbitration Agreement. (Doc. No. 72-4 at 14; Tr. at 99: 10-23.) However, when pressed by Defendant Kelly's counsel, Plaintiff conceded that "it is a safe assumption" that he electronically signed the box confirming acknowledgment of being provided a copy of the Arbitration Agreement (<u>id.</u> at 15; Tr. at 100: 12-23; <u>id.</u> at 16; Tr. at 101: 4-15), and responded – as to whether Plaintiff actually clicked on the link offering a copy of the Arbitration Agreement – that "[a] document like this yes, I would have clicked on it." (<u>Id.</u> at 15; Tr. at 100: 5-11.)

The record is undisputed that Plaintiff's electronic signature on the "acknowledgment statement check box" was required to proceed past the "arbitration screen" and submit the application forms to Kelly. (<u>See</u> Doc. Nos. 72-5 at 6; Tr. at 51: 16-24; 76-4 at 12-13; Tr. at 37: 4-24, 38: 1-9.) Defendant Kelly also provided the Court with a copy of "Kelly eRegistration Login Session Data" that purports to record Plaintiff's submission of his application, including the submission of the Arbitration Agreement. (Doc. Nos. 72-3 at 3; 72-5 at 6; Tr. at 51: 6-11; 72-6 at 2; 73 at 9.) The Arbitration Agreement was also available at the conclusion of the application in a "list of forms" to save and print. (Doc. No. 72-5 at 5; Tr. at 45: 4-14.)

Therefore, the Court finds that there is no genuine dispute that Plaintiff electronically received and signed the Arbitration Agreement on February 12, 2015.

### 2. The Employment Agreement

Plaintiff argues that the Arbitration Agreement was superseded by the Employment Agreement. (Doc. No. 76 at 16.) Plaintiff characterizes the Employment Agreement as providing that "Plaintiff does not agree to 'binding arbitration'" and considers the Employment Agreement irreconcilable with the Arbitration Agreement. (Id. at 17.) Kelly contends that the Employment Agreement's language "provides guidance on a potential method for non-binding dispute resolution, while the Binding Arbitration Agreement requires arbitration should those non-binding methods fail." (Doc. No. 73 at 18-19.)

The Employment Agreement was signed and dated by Plaintiff on February 13, 2015 and signed by a Kelly employee on February 20, 2015. (Doc. Nos. 76 at 12; 76-10 at 5; 77-5 at 20; Tr. at 99: 2-20.) The version of the Employment Agreement submitted to this Court does not identify the "Employer" with whom Plaintiff entered into the agreement or include the Employer's signature. (Doc. No. 76-10 at 2, 5.) However, in its response to a request for admission, the parties do not dispute that Kelly was the "Employer" and J&J was the "Customer" for purposes of the Employment Agreement. (Doc. No. 76-11 at 8-9; see Doc. No. 73 at 13, 17.) The Employment Agreement provides, in relevant part, as follows:

> **Dispute Resolution**  Some of our Customers offer systems or services designed to help resolve legal and other disputes between them and their employees. These systems or services, called Alternative Dispute Resolution (ADR) programs, can be very beneficial to all participants. ADR, however, is not limited to employee relationships. When a Customer is willing to make its ADR program available to help resolve disputes arising from your assignment to that Customer, we will disclose the availability of the program to you when you are assigned, and you agree to use it if a dispute arises. Eligible disputes could include those between you and the Customer, between you and us, or between you and both the Customer and us. Your agreement commits you to use non-binding ADR methods

such as communication with responsible persons, facilitated investigation, and mediation; but it does not commit you to use any system, service, or process that is legally binding with respect to the dispute itself (such as binding arbitration.)

(Doc. No. 76-10 at 4) (emphasis added). The Employment Agreement does not include an integration clause or otherwise refer to the Arbitration Agreement.

The Dispute Resolution section of the Employment Agreement contemplates the possibility that a Customer, namely J&J, may offer an ADR program to Plaintiff to help resolve disputes arising from Plaintiff's assignment to the Customer. (Id.) Specifically, the Dispute Resolution section provides that, "[w]hen a Customer is willing to make its ADR program available" to "resolve disputes arising from [Plaintiff's] assignment to that Customer," the Employer agrees to disclose the availability of the ADR program and Plaintiff agrees to participate in the ADR program. (Id.) The final sentence of the Dispute Resolution clarifies that the agreement to participate in a Customer's ADR program commits Plaintiff to "non-binding ADR methods" and does not commit Plaintiff to binding arbitration. (See id.)

"The threshold determination of whether a subsequent agreement entirely superseded a prior agreement is made under state law, without applying the FAA's presumption." Dasher v. RBC Bank (USA), 745 F.3d 1111, 1122 (11th Cir. 2014); see Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) ("To determine whether the parties agreed to arbitrate, we turn to 'ordinary state-law principles that govern the formation of contracts.'"). The Arbitration Agreement provides that any disputes related to Plaintiff's employment relationship with Defendant Kelly are governed by Michigan law. (Doc. No. 72-2 at 2.) However, this Court is not required to engage in an analysis as to whether Michigan law or Pennsylvania law applies because, as illustrated below, "there are no relevant differences between the laws of the two states" as to the superseding matter. See Auto–Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 404 (3d Cir. 2016).

Under Michigan law, "if parties to a prior agreement enter a subsequent contract which completely covers the same subject, but which contains terms inconsistent with those of the prior agreement, and where the two documents cannot stand together, the later document supercedes and rescinds the earlier agreement, leaving the subsequent contract as the sole agreement of the parties." <u>Nib Foods, Inc. v. Mally</u>, 246 N.W.2d 317, 321 (Mich. App. Ct. 1976) (citing <u>Joseph v. Rottschafer</u>, 227 N.W. 784 (Mich. 1929)).[5] Similarly, under Pennsylvania law, "in agreements between the same parties concerning the same matter, where the terms of the latter are inconsistent with those of the former, so that they cannot subsist together, the latter will be construed to discharge the former." <u>Thompson v. Craft</u>, 85 A. 1107, 1111 (Pa. 1913).[6]

Here, the Court finds that the Employment Agreement and the Arbitration Agreement can be read to "stand together" or "subsist together," <u>see</u> <u>Mally</u>, 246 N.W.2d at 321; <u>Thompson</u>, 85 A. at 1111, and appear to have been drafted to "cover two different territories," <u>see Synthes, Inc. v. Emerge Med., Inc.</u>, 25 F. Supp. 3d 617, 695 (E.D. Pa. 2014). The Court reads the Employment Agreement to provide that, when J&J "is willing to make its ADR program available" to Plaintiff to "help resolve disputes arising from" Plaintiff's assignment to J&J, Plaintiff agrees to participate in J&J's non-binding ADR program. (Doc. No. 76-10 at 4.) The Employment Agreement overlaps with the Arbitration Agreement where: (1) a dispute between

---

[5] The Supreme Court of Michigan noted "that it is not always necessary for a later contract to contain an integration clause in order for this later contract to supersede an earlier contract. Rather, if the later contract covers the same subject matter as the earlier contract and contains terms that are inconsistent with the terms of the earlier contract, the later contract may supersede the earlier contract, unless it appears that this is not what the parties intended." <u>Archambo v. Lawyers Title Ins. Corp.</u>, 646 N.W.2d 170, 177 n.16 (Mich. 2002) (citing <u>Joseph</u>, 227 N.W. at 784, 784 (Mich. 1929)).

[6] "It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." <u>Kroblin Refrigerated Xpress, Inc. v. Pitterich</u>, 805 F.2d 96, 107 (3d Cir. 1986) (citations omitted) (applying Pennsylvania law).

Plaintiff and Defendant Kelly arises from Plaintiff' assignment to J&J; (2) J&J is "willing to make its ADR program available" to help resolve that dispute between Plaintiff and Defendant Kelly; and (3) the dispute arising from Plaintiff' assignment to J&J falls within the Arbitration Agreement's "Covered Claims."  (Doc. Nos. 72-2 at 2; 76-10 at 4.)

Even assuming, arguendo, that all three of these conditions applied to the present dispute,[7] the Arbitration Agreement provides: "This Agreement can be revoked or modified only by a writing signed by me and an authorized representative of Kelly Services, referencing this Agreement and stating an intent to revoke or modify it."  (Doc. No. 72-2 at 3.)  The Employment Agreement makes no reference to the Arbitration Agreement, does not include an integration clause, and does not otherwise state an implicit intent to revoke the Arbitration Agreement. (Doc. No. 76-10 at 2-4.)  Therefore, the Court is unpersuaded that the Employment Agreement supersedes the Arbitration Agreement.

### 3.  Unconscionability of the Arbitration Agreement

Plaintiff also opposes Defendant's renewed motion to compel on the basis that the Arbitration Agreement is procedurally and substantively unconscionable.  (Doc. No. 76 at 23.) Under both Michigan and Pennsylvania law, "to prove that the arbitration clause is unconscionable, plaintiffs must demonstrate that the provision is both procedurally and substantively unconscionable."  See Lozada v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d 1087, 1100 (W.D. Mich. 2000) (applying Michigan law); see also Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 230 (3d Cir. 2008) (applying Pennsylvania law) (citing Salley v.

---

[7] The parties dispute whether Defendant J&J made any ADR programs available to Plaintiff.  (Doc. No. 73 at 18; 76 at 19.)  However, in his deposition, Plaintiff testified that he could not recall whether he was "ever provided an ADR Program from Johnson and Johnson." (Doc. No. 72-4 at 19; Tr. at 107: 11-13.)

Option One Mortg. Corp., 925 A.2d 115, 119-20 (Pa. 2007)).  The Court turns first to the matter of procedural unconscionability.

### i.      Procedural Unconscionability

Plaintiff contends that Defendant Kelly offered the Arbitration Agreement "on a take-it-or-leave-it basis," occupied a "far superior bargaining position relative to Plaintiff," and Kelly's online application required Plaintiff to click on a separate link to review the terms of the Arbitration Agreement.  (Doc. No. 76 at 24-25.)  Defendant contends that the Arbitration Agreement is not procedurally unconscionable because Plaintiff is college-educated, had time to consider the agreement, and ultimately took a job with another employer.  (Doc. No. 78 at 4.)  As discussed below, the Court finds that the Arbitration Agreement is not procedurally unconscionable given Plaintiff's background and the relative lack of economic compulsion.

"Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language."  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (applying Pennsylvania law); see also Clark v. DaimlerChrysler Corp., 706 N.W.2d 471, 474 (Mich. App. Ct. 2005).  Under Pennsylvania law, procedural unconscionability is assessed by considering the following factors: "the take-it-or-leave-it nature of the standardized form of the document[,]" "the parties' relative bargaining positions," and "the degree of economic compulsion motivating the 'adhering' party[.]"  Quilloin v. Tenet HealthSystem Philadelphia, Inc., 673 F.3d 221, 235-36 (3d Cir. 2012) (quoting Salley, 925 A.2d at 125).  Similarly, under Michigan law, "[p]rocedural unconscionability is determined by evaluating the bargaining power of the parties, their relative economic strength, and their alternative sources of supply."  Whirlpool Corp. v. Grigoleit Co., 713 F.3d 316, 322 (6th Cir. 2013) (citation omitted).

Here, Defendant Kelly offered Plaintiff the Arbitration Agreement on a "take-it-or-leave-it" basis. Defendant Kelly concedes that Plaintiff could not negotiate the Arbitration Agreement (Doc. No. 78 at 4), and that the online application could not be submitted without him electronically signing the Arbitration Agreement.[8] (See Doc. No. 72-5 at 2; Tr. at 38: 1-24.) However, the parties' relative bargaining position or "economic strength" lends little support to Plaintiff's unconscionability argument. Admittedly, Kelly is represented to be a "worldwide temporary employment staffing company." (Doc. No. 76 at 6.) However, as of December 20, 2016, Plaintiff Noye worked full-time as a consultant (Doc. No. 72-4 at 2; Tr. at 8: 4-20), made approximately $72,000.00 to 75,000.00 in 2015 (id. at 3; Tr. at 9: 13-18), previously worked as a manager and as an interim CEO at different companies (id. at 4, 6; Tr. at 28: 3-16; 40: 3-24), and was in the process of pursuing a master's degree at Harvard University (id. at 8; Tr. at 55: 12-18). The Court is unpersuaded that Plaintiff "lack[ed] a meaningful choice" at the time he signed the Arbitration Agreement. See Quilloin, 673 at 237.

Nonetheless, to the extent that any disparity in bargaining power or economic strength exists, the Court notes that the Arbitration Agreement is only two pages, is titled in large font-size "DISPUTE RESOLUTION AND MUTUAL AGREEMENT TO BINDING ARBITRATION," and states in bold typeface: "I understand and agree that arbitration is the only forum for resolving Covered Claims, and that both Kelly Services and I hereby waive the right to trial before a Judge or jury in federal or state court in favor of arbitration for Covered Claims." (Doc. No. 72-2 at 2.) Finally, as to the "degree of economic compulsion" or "alternative sources of supply," Plaintiff has not demonstrated that he lacked alternatives or faced a "degree of

---

[8] The Arbitration Agreement was also available at the conclusion of the application in a "list of forms" to save and print. (Doc. No. 72-5 at 5; Tr. at 45: 4-14.)

economic compulsion" when he signed the Arbitration Agreement.[9] Quillon, 673 F.3d at 235-36.  Thus, the Court finds that Plaintiff has not adequately demonstrated that the Arbitration Agreement is procedurally unconscionable.  While both Michigan and Pennsylvania law require a showing of both procedural and substantive unconscionability to demonstrate the unconscionability of an agreement, and the Court has found that Plaintiff has not met his burden to demonstrate procedural unconscionability, in the interest of completeness, the Court will also address the parties' arguments regarding substantive unconscionability.

### ii.    Substantive Unconscionability

Plaintiff contends that the Arbitration Agreement is substantively unconscionable because: (1) the agreement narrows the statute of limitations for FCRA claims to 300 days; and (2) the agreement provides that arbitration agreements will be confidential.  (Doc. No. 76 at 25-26.)  Defendant Kelly argues that the 300-day limitations period is reasonable and severable, in addition to arguing that the confidentiality provision is not unconscionable.  (Doc. No. 78 at 6-7.)  In response to Defendant's invitation to sever the provision shortening the limitations period, Plaintiff claims that the contested provisions cannot be severed from the Arbitration Agreement because they "reflect 'a systematic effort to impose arbitration on an employee . . . as an inferior forum that works to the employer's advantage.'"  (Doc. No. 76 at 27) (citation omitted).

_____

[9] Plaintiff only argues that, "[i]f Plaintiff did not check the box acknowledging the Arbitration Agreement, he would have had to forfeit his job offer and return to searching for other work."  (Doc. No. 76 at 24.)  "The fact that [an employer] essentially made the terms of the application a precondition to employment does not rise to the level of procedural unconscionability."  Sams v. Common Ground, No. 329600, 2017 WL 430233, at *3 (Mich. Ct. App. Jan. 31, 2017).  Moreover, in his deposition, Plaintiff testified that he earned approximately $72,000.00 to 75,000.00 during the year he signed the Arbitration Agreement, and Plaintiff has made no meaningful assertions of "economic compulsion" or a lack of employment alternatives in his submissions to this Court.  (Doc. Nos. 72-4 at 3; Tr. at 9: 13-18; 76.)

"Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (applying Pennsylvania law); see also Clark v. DaimlerChrysler Corp., 144, 706 N.W.2d 471, 475 (Mich. App. Ct. 2005) ("Substantive unconscionability exists where the challenged term is not substantively reasonable."). First, as to the shortened limitations period, the Arbitration Agreement provides:

> **6. Limitations on Actions.** Kelly Services and I agree to bring any claims that each party may have against the other within 300 days of the day that such party knew, or should have known, of the facts giving rise to the cause of action, and the parties mutually waive any longer, but not shorter, statutory or other limitations period.

The foregoing language shortens the "statute of limitations for FCRA claims from at least two years to just 300 days." (Doc. No. 76 at 25); see 15 U.S.C. § 1681p.

Indeed, the arbitrability of statutory claims like the FCRA "rests on the assumption that the arbitration clause permits relief equivalent to court remedies." Paladino v. Avnet Computer Techs., 134 F.3d 1054, 1062 (11th Cir. 1998) (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991)). However, the shortened limitations period's impact on Plaintiff's individual claims is neither clear nor discussed in Plaintiff's brief in opposition to Defendant Kelly's renewed motion. (Doc. No. 76.) Absent any evidence that Plaintiff cannot vindicate his "statutory rights in the arbitral forum," the Court declines to decide whether shortened limitations period is substantively unreasonable. See Atl. Textiles v. Avondale Inc., 505 F.3d 274, 290 (4th Cir. 2007).

Second, as to the confidentiality provision, the Third Circuit has remarked that "there is nothing inherent in confidentiality itself that favors or burdens one party vis-a-vis the other in the dispute resolution process." Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 279-80 (3d Cir. 2004); see also Garcia ex rel. Eckert v. HCR ManorCare, LLC, No. 1743-2014, 2016 WL

127514, at *8 (Pa. Super. Ct. Jan. 12, 2016) (finding that an arbitration agreement that included a confidentiality provision was not substantively unconscionable). The Court finds this substantive unconscionability argument, based on the existence of the confidentiality provision, to be unavailing.

Accordingly, having determined that the Arbitration Agreement is neither unconscionable nor superseded by the Employment Agreement, the Court finds that there is no genuine dispute that a valid arbitration agreement exists between Plaintiff and Defendant Kelly. Flintkote Co., 769 F.3d at 220. The Court turns next to whether the Arbitration Agreement covers Plaintiff's two FCRA claims. (Doc. No. 72.)

### 4. Whether the Arbitration Agreement Covers Plaintiff's Claims

Defendant maintains that Plaintiff's claims are "employment-related" and covered by the Arbitration Agreement. (Doc. No. 73 at 15.) Plaintiff argues that the Arbitration Agreement does not cover pre-employment disputes and casts doubt on whether Plaintiff was employed. (Doc. No. 76 at 20-23.) Resolution of whether the Arbitration Agreement covers Plaintiff's claims requires a determination of whether: (1) Defendant Kelly hired Plaintiff; and (2) Plaintiff's alleged FCRA violations relate to Plaintiff's employment. The Court first addresses Plaintiff's employment status.

### i. Whether Defendant Kelly Hired Plaintiff

Having reviewed the record, the Court is persuaded that Defendant Kelly hired Plaintiff on or around February 2015. First, on February 12, 2015, a Kelly "on-boarding coordinator" sent Plaintiff an e-mail that guided him through Kelly's hiring and "on-boarding" process.[10]

_____

[10] The February 12, 2015 e-mail discussed the four steps in Kelly's hiring process that culminate in Plaintiff completing the "Kelly and Customer Hiring Documents" and the "Remote i9 Verification." (Id. at 3.) The February 12, 2015 e-mail also provided that: "After the On-

(Doc. No. 76-9 at 2.)  On February 20, 2015, the Kelly "on-boarding coordinator" sent Plaintiff

an e-mail welcoming him to "the Kelly Team!" and stating, in relevant part:

> Welcome to Kelly Services!
>
> Now that you have been hired, I want to give you an overview on the next steps in the process.
>
> Once your background screening is complete, your recruiter will notify you that you are ready to start.  We will only contact you about your background screening if we have a question or need more information.

(Doc. No. 76-8 at 2.)  On March 10, 2015, according to the complaint, Kelly "informed Plaintiff

that he had cleared its screening process . . . ."  (Doc. No. 1 ¶ 32.)

A Kelly employee, Melissa Hammond, stated in her December 13, 2016 deposition that

Plaintiff was hired, "is a hired employee and remains a hired employee of Kelly Services."

(Doc. No. 72-5 at 7; Tr. at 106: 5-24; see Doc. Nos. 72-3 ¶ 3; 76 at 12 n.3.)  In response to

Plaintiff's first set of requests for admissions, Defendant Kelly admitted that "Plaintiff Noye

applied for employment and was hired by Kelly."  (Doc. No. 77-10 at 8; see Doc. No. 77-10 at

11.)  Defendant Kelly also responded that "Plaintiff Noye has been employed by Defendant since

approximately February 2015, and continues to remain eligible for assignment at Defendant."[11]

(Doc. No. 76-6 at 11-12.)

---

boarding is completed, you will receive a final email from your On-boarding Coordinator giving you an overview of what will happen next between the time of hire (I9) and the start of your assignment."  (Id. at 4.)  By February 13, 2015, Plaintiff had completed Kelly's online application and signed the Employment Agreement addressing the terms of his assignment with J&J. Then, on February 16, 2015, a Kelly recruiter contacted Plaintiff about his disclosure of a criminal conviction in his online application.  (Doc. No. 76-7 at 2.)  Plaintiff alleges that he "promptly supplied Kelly with all requested documentation."  (Doc. No. 1 ¶ 29.)

[11] In contrast, Defendant J&J's Rule 30(b)(6) witness, William Korbich, Jr., testified that: "I don't know if [Plaintiff] was already an employee at Kelly or being -- through the search agency as a staff to be placed at a Kelly role . . . ."  (Doc. No. 75-5 at 11.)

Nonetheless, Plaintiff casts doubt on whether Kelly hired or employed Plaintiff by emphasizing that Plaintiff never started his J&J assignment.[12]  Specifically, Plaintiff urges this Court to adjudge whether Plaintiff could "possibly be described as having been employed by Kelly" and infer Plaintiff's employment-status from the fact that Plaintiff never started his J&J assignment.  (See Doc. No. 76 at 22-23.)  However, even when considering the record in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute that Defendant Kelly hired Plaintiff on or around February 2015.  Therefore, given that Defendant Kelly did hire Plaintiff on or around February 2015, the Court declines to determine whether the Arbitration Agreement would cover an individual that "cannot possibly be described as having been employed by Kelly."  (Doc. No. 76 at 22-23.)

### ii.     Coverage of "Pre-Employment" Disputes

Second, Plaintiff contends that the Arbitration Agreement does not cover pre-employment disputes.  (Doc. No. 76 at 20.)  Plaintiff reasons that the language of the Arbitration Agreement "cover[s] only those claims arising after the start of Plaintiff's employment, not those arising before."[13]  (Id. at 20-21.)  Defendant Kelly broadly argues that Plaintiff's FCRA claims relate to Plaintiff's employment.  (Doc. No. 78 at 8.)

---

[12] Plaintiff also challenges Melissa Hammond's deposition testimony that Plaintiff is "currently an employee of Kelly" and stresses Hammond's inability to identify an assignment that Kelly offered to Plaintiff.  (Doc. No. 76 at 12 n.3.)  In a similar vein, Plaintiff submitted his own declaration stating that: Defendants Kelly and J&J rescinded his job offer, that Defendant Kelly "never contacted [him] regarding any other job opportunities," and that Plaintiff never "stepped foot" into defendants' facilities, worked any hours for the defendants, or received a paycheck from the defendants.  (Doc. No. 76-14 at 2.)

[13] Plaintiff stresses that, although the Arbitration Agreement distinguishes between "employment" and "consideration for employment" as well as between "employees" and "candidates" in its introductory paragraphs, the "Agreement to Arbitration" and "Claims Subject to Agreement" sections of the Arbitration Agreement refer only to "claims relating to my employment," not to claims arising out consideration for employment.  (Doc. No. 72-2 at 2.)

"[F]ederal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration."  <u>Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 55 (3d Cir. 2001) (citations omitted).  However, "[t]he presumption in favor of arbitration does not 'take [ ] courts outside [the] settled framework' of using principles of contract interpretation to determine the scope of an arbitration clause."  <u>CardioNet, Inc. v. Cigna Health Corp.</u>, 751 F.3d 165, 172-73 (3d Cir. 2014) (quoting <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 298 (2010)).  "To determine whether a claim falls within the scope of an arbitration agreement, the 'focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint.'"  <u>Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 55 (3d Cir. 2001) (citation and internal quotation omitted).

The Arbitration Agreement provides, in relevant part, as follows:

**Internal Dispute Resolution.**  I acknowledge that raising issues or concerns internally may address my concerns more efficiently. I further acknowledge that Kelly encourages all <u>employees/candidates</u> to approach immediate supervisors or managers with any issues or concerns they have and, if the matter is not resolved in a timely or satisfactory fashion by those supervisors or managers, to contact the Human Resources Representative  . . . .

In the event that these internal dispute resolution procedures do not resolve my issues or concerns informally, and in consideration of my <u>employment/consideration for employment</u> with Kelly and Kelly's mutual promise to arbitrate the categories of claims for relief that fall within the scope of this Agreement, I agree as follows:

**1. Agreement to Arbitration.** Kelly Services, Inc. ("Kelly Services") and I agree to use binding arbitration, instead of going to court, for any "Covered Claims" that arise between me and Kelly Services, its related and affiliated companies, and/or any current or former employee of Kelly Services or any related or affiliated company.

**2. Claims Subject to Agreement.** The "Covered Claims" under this Agreement shall include all common-law and statutory claims <u>relating to my employment</u>, including, but not limited to, any claim for breach of contract, unpaid wages, wrongful termination, unfair competition, and for violation of laws forbidding discrimination, harassment, and retaliation on the basis of race, color, religion, gender, age, national origin, disability, and any other protected status. **I**

**understand and agree that arbitration is the only forum for resolving Covered Claims, and that both Kelly Services and I hereby waive the right to a trial before a judge or jury in federal or state court in favor of arbitration for Covered Claims.**

(Doc. No. 72-2 at 2) (emphasis added).

The Court turns first to Plaintiff's 15 U.S.C. § 1681b(b)(3) claim. Here, Plaintiff alleges in his complaint that Defendants Kelly and J&J violated § 1681b(b)(3) when it failed to provide Plaintiff with a copy of his criminal background report and a summary of his FCRA rights before rescinding his J&J position. (See Doc. No. 1 ¶¶ 7-8, 33-36.) Plaintiff's § 1681b(b)(3) claim relates to his employment at Kelly because, according to the complaint, Defendant Kelly's failure to provide Plaintiff with a copy of the Yale background report and a description of his consumer rights under the FCRA implicated his assignment with J&J and resulted in an adverse employment action. (Doc. No. 1 ¶¶ 33, 36, 68-69.) Furthermore, even assuming arguendo that Arbitration Agreement "cover[s] only those claims arising after the start of Plaintiff's employment" (Doc. No. 76 at 20-21), the 15 U.S.C. § 1681b(b)(3) claim would still relate to Plaintiff's employment because: (1) Defendant Kelly hired Plaintiff on or around February 2015; (2) J&J rescinded the position on March 14, 2017 (Doc. No. 77-13 at 12;); and (3) the J&J assignment was rescinded due to a background report that was not completed until March 10, 2017 (Doc. No. 1 ¶ 33; see Doc. No. 77-16 at 5).

Second, in his 15 U.S.C. § 1681b(b)(2) claim, Plaintiff alleges that Defendant Kelly required Plaintiff to sign a "Background Screening Notice, Disclosure, and Authorization" form ("Disclosure Form") on February 13, 2015 that: (1) was not a "stand-alone document;" and (2) authorized the "procurement of a consumer report 'at any time, and any number of times, as Kelly in its sole discretion determines is necessary before, during or after my employment . . . .'" (Doc. No. 1 ¶¶ 5-6, 22-23, 27; see Doc. No. 75-3 at 2-3.) In particular, Plaintiff alleges that:

"Defendant Kelly is liable for willfully or negligently violating section 1681b(b)(2) of the FCRA by procuring or causing to be procured a consumer report <u>for employment purposes</u> without first providing a clear and conspicuous disclosure in writing to the consumer in a document that consists solely of the disclosure that a consumer report may be obtained for employment purposes." (Doc. No. 1 ¶ 17.) Plaintiff's efforts to characterize its § 1681b(b)(2) claim as not relating to Plaintiff's employment are unavailing given that Plaintiff's § 1681b(b)(2) claim, as alleged in the complaint, implicates the procurement of a consumer report "for employment purposes" before, during or after Plaintiff's employment. (<u>Id.</u> ¶¶ 6, 17.)

Accordingly, the Court finds that the Arbitration Agreement covers both Plaintiff's § 1681b(b)(2) and § 1681b(b)(3) claim and that Plaintiff's claims against Defendant Kelly are subject to arbitration.

### 5. Whether to Dismiss or Stay Plaintiff's Claims against Defendant Kelly

In its renewed motion to compel arbitration, Defendant Kelly requests that this Court "stay these proceedings pending completion of the arbitration." (Doc. No. 72 at 1) (citing 9 U.S.C. § 3). Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. In <u>Lloyd v. HOVENSA, LLC</u>, the Third Circuit provided that "the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration. The directive that the Court 'shall' enter a stay simply cannot be read to say that the Court shall enter a stay in all cases except those in which all claims are arbitrable and

the Court finds dismissal to be the preferable approach." 369 F.3d 263, 269 (3d Cir. 2004).

Accordingly, upon consideration of Defendant Kelly's request, the Court will stay the above-captioned action pending completion of the arbitration.

> **B.      Defendant J&J's Renewed Motion to Compel Arbitration**

Defendant J&J urges the Court to also order Plaintiff to arbitrate his claims against J&J pursuant to the Arbitration Agreement. (Doc. No. 41 at 8, 20-24.) J&J argues that, even as a non-signatory to the Arbitration Agreement, it may compel arbitration under the theory of equitable estoppel. (See Doc. No. 75 at 17-21.) Plaintiff characterizes J&J's attempt to invoke the Arbitration Agreement as "truly absurd" and contends that the circumstances do not warrant permitting J&J to invoke the Arbitration Agreement. (Doc. No. 77.) The Court declines to resolve J & J's renewed motion to compel arbitration at this time; rather, the Court will direct the parties to brief the issue of the applicability of the theory of equitable estoppel to the motion in light of the Third Circuit's recently-issued precedential opinion in White v. Sunoco, 870 F.3d 257 (3d Cir. 2017).

## IV.      CONCLUSION

The Court will grant Defendant Kelly's renewed motion to compel arbitration and to stay the claims asserted against Defendant Kelly pending completion of the arbitration. With regard to Defendant J & J's renewed motion to compel arbitration and dismiss, or, in the alternative, stay all proceedings, the Court will direct the parties to brief the issue of the applicability of the theory of equitable estoppel to the motion in light of the Third Circuit's recently-issued precedential opinion in White v. Sunoco, 870 F.3d 257 (3d Cir. 2017). An Order consistent with this Memorandum follows.